CATHOLIC ARCHDIOCESE OF DEN-
VER, a Colorado non-profit corpora-
tion; McGraw Hill Information Sys-
tems Co./Dodge Division, a New York
corporation; the Colorado Leader, Inc.,
a Colorado corporation; the Colorado
Political Press, Inc., a Colorado corpo-
ration; J. Ivanhoe Rosenberg, d/b/a
the Herald-Dispatch; Intermountain
Jewish News, Inc., a Colorado corpora-
tion; Denver Publishing, Inc., a Colora-
do corporation; Warren Peterson;
Hans Leiso; Rosendo Lerma; Stan
Boxter; Justin Koseba; Janet Weston;
Mary Zachman; and Earnest Zachman,
Plaintiffs-Appellants,

v.

CITY AND COUNTY OF DENVER, a Mu-
nicipal corporation; and Carl H. Gus-
tafson, Manager of Revenue, City and
County of Denver, Defendants-Appel-
lees.

The DENVER POST CORPORATION, a
Colorado corporation; and the Denver
Publishing Company, d/b/a Rocky
Mountain News, Plaintiffs-Appellants,

v.

CITY AND COUNTY OF DENVER; and
Carl H. Gustafson, Manager of Revenue
for the City and County of Denver, De-
fendants-Appellees.

No. 85SA172.

Supreme Court of Colorado,
En Banc.

July 27, 1987.

Cooper & Kelley, P.C., Thomas B. Kelley, Denver, for plaintiffs-appellants.

Eiberger, Stacy & Smith, Rodney L. Smith, Denver, for The Denver Post Corp.

Baker & Hostetler, James A. Clark, Bruce D. Pringle, Denver, for The Denver Pub. Co.

Stephen H. Kaplan, City Atty., Donald E. Wilson, Asst. City Atty., Denver, for defendants-appellees.

ROVIRA, Justice.

Appellants, publishers, retailers, carriers, and consumers of various newspapers in the Denver area, appeal from a judgment of the district court which upheld the Denver retail sales tax ordinance as applied to them, upheld the regulations promulgated thereunder, and affirmed an assessment against the Denver Post Corp. (*Post*) and the Denver Publishing Co. d/b/a the *Rocky Mountain News* (*News*). Appellants contend that the trial court misread the ordinance and regulations and that the ordinance and regulations are unconstitutional as applied to them. We affirm the judgment of the trial court on the issue of the constitutionality of the ordinance, but we agree with appellants that the trial court erred in its interpretation of the ordinance and accordingly reverse that part of the judgment.

I.

Prior to 1982, retail sales of newspapers were exempt from the Denver retail sales tax. Denver, Colo. *Revised Municipal Code* (1950) (*Code*), § 166.2–11. In 1981, the Denver City Council repealed and reenacted the retail sales tax article, and, in doing so, repealed the exemption for newspapers effective January 1, 1982. Denver, Colo. Ordinance 81–666 (December 7, 1981) (City Retail Sales Tax Article).[1] Accordingly, newspapers were treated as all other personal property under the retail sales tax ordinance.

The ordinance provided that "there is levied and there shall be collected and paid a tax in the amount stated in this article, ... on the purchase price paid or charged upon all sales and purchases of tangible personal property at retail." *Code* §§ 166.4 and 166.4–1.

"Retail sale" was defined as any sale other than one at wholesale. *Code* § 166.-2–6. "Wholesale sale" was defined as "a sale by wholesalers to retail merchants, jobbers, dealers or other wholesalers for resale...." *Code* § 166.2–4. "Wholesaler" was defined as "a person doing a regularly organized wholesale or jobbing business, and known to the trade as such, and selling to retail merchants, jobbers, dealers, or other wholesalers, for the purpose of resale." *Code* § 166.2–3.

On February 22, 1982, the Denver Department of Revenue promulgated regulations entitled "Rules Regarding the Assessment and Collection of Sales and Use Taxes on the Sales and Use of Newspapers and Other Publications." (Regulations) They provided, in part:

1. Sales-for-resale of such publications to vendors (a) who are licensed as retailers pursuant to said Sales and Use Tax Articles and General Licensing Provisions of the Denver Revised Municipal Code, and (b) who sell such publications

---

1. The entire *Code* was recodified on September 1, 1982. Apparently because that exhaustive recodification was imminent, the section numbers and organization of the retail sales tax article found in ordinance 81–666 were never incorporated into the *Code*. The first appearance of the language of ordinance 81–666 in the *Code* was in the 1982 version. We use the section numbers from ordinance 81–666, as they existed at the time this case arose, prior to the 1982 recodification.

to purchasers from commercial locations, such as places of retail business or vending machines, shall be considered to be wholesale sales. All other sales by publishers or vendors of such publication shall be presumed to be retail sales on which the publisher or vendor must collect and remit the Sales Tax ... the presumption may be rebutted by such reasonable proof as the Manager deems adequate.

2. Sales of newspapers by publishers or licensed retailers to independent news carriers shall be presumed similarly to be sales at retail and taxable transactions. The tax in such cases shall be measured by the purchase price paid by the news carrier to the publisher or licensed retailer. The term "News carrier" as used herein shall mean those hawking newspapers on regularly established routes or at random locations.

. . . .

6. Publications vended through vending machines located within the City are subject to the Sales Tax and the vendor must, regardless of the price of the publication, pay over to the Manager of Revenue an amount equivalent to 3% of gross sales made through vending machines.

In March 1982, the *Post* was assessed a tax in the amount of $1,200, a 10% penalty, and a 6% interest penalty for a total of $1,360, covering the period from February 22 through February 28. On April 12, the *News* received an identical assessment.[2] The publishers of both papers filed petitions to cancel the assessment. On June 9, 1982, an evidentiary hearing was held before the Deputy Treasurer acting as hearing officer on behalf of the Manager of Revenue.

There were four witnesses at the hearing: Howard Greenberg and Ronnie Myatt (circulation directors for the *Post* and *News*, respectively), Donald Guttenstein (a field audit supervisor for the Department of Revenue), and Dennis McNeill (a profes-

sor at the University of Denver Business School).

The testimony of the two circulation directors was substantially the same. Each testified as to the distribution methods used by their respective newspapers, and especially to the relationship between the publishers and the news carriers. Both testified that carriers entered into a contract to buy papers from the publishers and to deliver them to the consumers on their route. At the end of each month, the carrier was billed, at a rate below retail, for the papers he had purchased. Each newspaper also sold to independent distributors who functioned as intermediate wholesalers, buying from the publishers and selling to carriers who, in turn, resold to the public.

Generally, the carriers collected from the consumers, with the differential between the price the consumers paid and the price the carrier paid being the carriers' profit. The publishers would accept payments from customers and credit the payments to the accounts of the carriers. If a paper was not received by the consumer, the consumer had the option of calling the carrier or calling the publisher. If the publisher was called, a salaried employee was sent out with a replacement paper and the carrier's account was charged.

Both directors testified that they were familiar with the newspaper trade, and that the *Post* and *News* were recognized as wholesalers within the trade and that the sale from the publishers to the carriers was a wholesale sale.

Professor McNeill, a Ph.D. in marketing and accepted as an expert in the field, also testified that both the *Post* and *News* were recognized in the trade as wholesalers. He further testified that sales by the publishers to their respective carriers was wholesale in nature, and not retail.

Guttenstein testified that he had participated in drafting the regulations and it was his job to administer the ordinance and

---

**2.** Both the *Post* and the *News* sell papers in a variety of ways: to independent news carriers who resell them to consumers, to independent distributors who resell them to carriers, to licensed retailers who resell them to consumers, and directly to consumers through vending machine sales. The assessment was an estimate and only covered the sales to news carriers, independent distributors, and through vending machines.

regulations. He testified that the regulations were drafted with efficient tax collection in mind, despite the fact that sales from the publishers to their news carriers were wholesale. Along this line, he noted that since the *Post* and *News* together had approximately 1,500 to 2,000 carriers and there was approximately a 100% annual turnover rate, it would be impractical to license the news carriers and require returns to be filed by them.

He also testified that in many circumstances where the marketing of a product was unusual—door-to-door cosmetic sales and girl scout cookies, for example—a deal was usually struck with the wholesaler to facilitate collection. He also testified that items sold for less than 19¢ were included in calculating the sales of the merchant in determining the amount of tax he owed.

The hearing officer issued findings of fact and conclusions of law which were adopted by the Manager of Revenue. He found that the news carriers were not employees of either the publishers or the subscribers, but were independent contractors. He also found that the transactions between the publishers and the carriers were "wholesale" in the trade lexicon, and that the resale to the subscribers was a "retail" sale.

The hearing officer found that the regulations created a rebuttable presumption that a sale to an unlicensed news carrier or independent distributor was not a wholesale sale. In determining that the *Post* and *News* had not overcome the presumption, he stated that

> no proof was offered whatsoever that any news carrier or independent distributor during the audited period was the holder of the City Retail Sales License.
>
> . . . .
>
> The hearing officer does not, of course, foreclose in a proper case before him the news carrier coming forward to demonstrate that he, indeed, does hold a Retail Sales License and his purchases from the publisher should be exempt under the "sales for resale" standard.

Since the presumption was not overcome, the sales to the unlicensed news carriers and independent distributors were "retail" for purposes of the ordinance and, accordingly, the *Post* and *News* owed retail tax on those sales. However, the hearing officer determined that sales to independent distributors who resold the papers to licensed retailers were exempt. The hearing officer also concluded that sales to licensed retailers, such as newsstands, were wholesale and therefore no retail tax was due on them.

The hearing officer also found that the *Post* and *News* acted in the capacity of a retail merchant when selling papers through vending machines. Accordingly, he ruled that the publishers must, regardless of the price of the newspaper, pay an amount equal to 3% of gross taxable sales.

In November 1982, both the *News* and the *Post* filed a complaint pursuant to C.R. C.P. 106(a)(4) alleging the decision was arbitrary, capricious, an abuse of discretion, contrary to law, and in excess of the jurisdiction of the Manager of Revenue. In a separate action filed several months earlier, all appellants sought a declaratory judgment that (1) the regulations conflicted with the sales tax ordinance, and (2) the ordinance and regulations were unconstitutional on their face and as applied by the city. The two suits were consolidated for trial and cross-motions for summary judgment were filed by all parties.

The decision of the Manager of Revenue was affirmed by the trial court, which held the ordinance and regulations were not unconstitutional. The trial court also held that implicit in the definition of "wholesaler" in the ordinance was the limitation that only sales to *licensed* retailers were covered, because separate provisions of the tax code required all retailers to obtain licenses. Therefore, the sales to the unlicensed news carriers were not wholesale sales and accordingly must be retail sales. The court concluded that the tax was owed by the "retailer," *i.e.*, the *Post* and *News*. The court also determined that the news carriers were agents of the *Post* and *News* and that the publishers were therefore retailers and owed the tax.

In the alternative, the court ruled that even if the news carriers were independent retailers, the *Post* and *News* should nonetheless collect and pay the tax because otherwise the monies the city expected to collect would be "lost." The court also ruled that the *Post* and *News* owed a tax on the vending machine sales in an amount equivalent to 3% of gross taxable sales.

On appeal, appellants argue that the trial court misread the ordinance, that it made erroneous findings and conclusions as to whether the news carriers are agents of the publishers, and that the regulations exceed the scope of the ordinance or, if they do not, the ordinance and regulations are unconstitutional. Because of the constitutional questions raised, the appeal was referred to this court. Section 13–4–110(1)(a), 6 C.R.S. (1973).

## II.

### THE ASSESSMENT

#### A.

We turn first to the papers sold for resale to the public. These sales may be through independent distributors, "licensed" retailers, such as newsstands and convenience stores, or to "unlicensed" news carriers. There is no dispute that licensed retailers must collect the tax from the public and turn it over to the city. The issue before us is whether the *Post* and *News* must collect and pay the tax on sales to consumers through independent distributors and unlicensed news carriers.

The trial court was clearly correct in rejecting the analysis of the hearing officer. The officer observed that paragraphs 1 and 2 of the regulations created a rebuttable presumption that sales to news carriers who did not have retail sales licenses were not retail in nature. However, he then held that the only way to rebut the presumption was to establish that the carriers did in fact have retail licenses.

This circular reasoning turned the rebuttable presumption into an irrebuttable one—the only way to overcome the presumption established by the lack of a retail sales license was to produce a retail sales license. This destroys the meaning of the term "rebuttable" found in paragraph 1.

The trial court instead read the "license" requirement into the ordinance itself. It ruled that since another provision of the retail sales ordinance required all retail merchants to have a license, only sales to "licensed retailers" fell within the definition of "wholesale." We disagree with that interpretation.

First, the ordinance is clear on its face. It exempts from retail sales tax sales by "wholesalers to retailers ... for resale." The *Post* and *News* are both recognized in the trade as wholesalers of newspapers. The sales were made not to consumers, but to news carriers for resale. Thus, the sales clearly fall within the letter of the ordinance. When an ordinance is facially unambiguous, its plain meaning should not be altered by judicial construction. *People v. Mascarenas*, 706 P.2d 404 (Colo.1985). The fact that it is illegal for a news carrier who sells at retail not to have a license does not alter the plain definition found in the ordinance.[3]

Moreover, even if the language of the ordinance were ambiguous—allowing either a "licensed-retail only" or an "any retail" interpretation under the definition of wholesale—then the ambiguity must be resolved against the taxing authority. *E.g., Transponder Corp. v. Property Tax Adm.*, 681 P.2d 499, 504 (Colo.1984) (relying on "long-standing rule" that all doubts in construction resolved in favor of the taxpayer).

The trial court also found that the carriers were merely agents of the *Post* and *News*, who were "retailing," through the carriers, to the public. The evidence does not support this finding. The hearing officer, on virtually uncontradicted evi-

---

3. *Code* section 166.3 provides that "[n]o person shall engage in the business of selling within the City at retail without first obtaining a City Retail License...." Subsections provide for obtaining licenses, fees, and other administrative matters.

dence, found that the carriers were not employees of the publishers. All four witnesses testified that a "wholesale sale" occurred between the publishers and the news carriers. The officer found that a "sale" occurred when the papers were transferred from the publishers to the news carriers—such could not be the case if the carriers were agents of the publishers.

Also, if no sale occurred when the papers were transferred to the news carriers, then the tax collected should be based upon the retail price paid by consumers. However, the regulations require, and the trial court held, that the base of the tax assessment should be the price the carriers paid. This anomalous situation cannot be reconciled. The trial court erred in holding that the carriers were agents of the publishers.

The trial court held in the alternative that, even if the sales to the carriers were wholesale, the publishers still had to collect the tax, otherwise the revenue the city expected to obtain through the tax would be "lost." We are pointed to no provision of law that allows the judiciary to authorize the city to collect a retail tax from the wholesaler simply because it is less cost efficient to collect it from the retailer.[4] Administrative difficulty cannot be a justification for judicially rewriting a clear and unambiguous ordinance.[5]

Having concluded that the ordinance cannot be interpreted to limit the definition of wholesale sales to licensed retailers, it is apparent that the sales from the publishers to the carriers were wholesale. As such, Denver cannot hold appellant publishers responsible for collecting the sales tax. *See Code* § 166.7 (retailer liable and responsible for collection of tax from consumer).

### B.

We turn next to the vending machine sales. At the time in question, the *News* and *Post* sold daily papers for 15¢ and Sunday papers for 50¢. The trial court held the publishers liable for the sales tax on both types of sales. There is no doubt that the publisher is functioning as a retailer in this context. The publishers do not contest the tax on the Sunday sales, but contend that since the consumer is required to pay the tax and section 166.8 of the tax article prohibits the publishers from collecting the tax on the 15¢ daily papers they are not liable for the payment of the tax.

A basic premise of the publishers' argument is that the consumer, not the retailer, is supposed to pay the tax. A review of some of the provisions of the tax article is necessary to evaluate the publishers' argument.

Section 166.1 states that the article will be known as the City Retail Sales Tax article. Section 166.6 provides that if there is a dispute between the vendor and the purchaser as to whether the tax is owed, "the vendor shall collect and the purchaser shall pay" the tax pending resolution of the dispute. Section 166.6 also states that it is a violation of the article "for any vendor to fail to collect, or for any purchaser to fail to pay, the tax levied by this article."

Subsection 166.8–2 states that the "retailer shall be entitled as collecting agent of the city [to certain credits]." Subsection 166.8–6 provides that a retailer may not advertise that the tax is assumed or paid by him, or that the tax will not be added to the selling price, or, if added, that the tax or any part thereof will be refunded.

These provisions are sufficient to convince us that Denver intended the consum-

---

**4.** Apparently, the administrative difficulty in collecting from the news carriers is the primary reason for the city's attempts to collect the sales tax from the wholesaler. Guttenstein, one of the drafters of the regulations, testified that he recognized that the transaction between the publishers and the news carriers was wholesale, but the regulations were nonetheless written with collection from the publishers in mind. We are unaware of any provision of law that prevents the city from requiring the news carri-

ers to obtain a retail license or collecting the tax from them.

**5.** Since the time this case began, the ordinance has been amended to include only sales to "licensed" retailers in the definition of "wholesale sale." *See* Denver, Colo. *Revised Municipal Code* (1982) § 53–24(17) (effective Dec. 17, 1984).

er and not the retailer to pay the tax. *Compare Bedford v. Hartman Brothers, Inc.,* 104 Colo. 190, 89 P.2d 584 (1939) (sales tax imposed by State of Colorado is a tax on consumer with retailer only acting as collecting agent for state) *with Virden v. Schaffner,* 496 S.W.2d 846 (Mo.1973) (sales tax a "privilege tax" imposed on retailer for privilege of engaging in business of selling personal property at retail; retailer, not consumer, responsible for payment of tax).

In support of their position that they were not allowed to collect a tax on vending machine sales of 15¢, the publishers rely on the following provision:

There is imposed and levied upon all taxable sales of commodities and services specified in this article, except aviation fuel, a tax in accordance with the following schedule:

| Amount of Purchase Price | Tax |
| --- | --- |
| $0.01 including $0.18 | No tax |
| 0.19 including 0.51 | $0.01 |
| 0.52 including 0.84 | 0.02 |
| 0.85 including 1.00 | 0.03 |

On sales in excess of one dollar the tax shall be three cents ($0.03) on each full dollar of the purchase price, plus the tax shown in the above schedule for the applicable fractional part of a dollar of each such price.

*Code* § 166.8.

In response, the city relies on the following provision of the tax article:

*Amount.* Every retailer shall, irrespective of other provisions of this article, be liable and responsible for the payment of an amount equivalent to three (3) percent of gross taxable sales made by him of commodities or services specified in this article....

*Code* § 166.7.

The city argues that this section, by its express terms, controls over section 166.8, and that the schedule in section 166.8 is only for the convenience of the merchant in approximating the tax to be collected on each isolated sale.

The construction of the sales tax article is not so simple, however. Section 166.7 provides that the retailer is "liable and responsible for the payment of an amount equivalent to three percent of gross taxable sales," but does not by its express terms impose or levy a tax. It does not empower the retailer to collect a tax. Section 166.4 provides that "There is levied and there shall be collected and paid a tax in the amount stated in this article...." but does not state what the amount of the tax to be levied is.

Two sections of the tax article specifically deal with sales from vending machines. Section 166.8–3 provides an exception to the general rule that the retailer may not include the tax in the purchase price of the item. The exception applies only to retail sales of liquor by the drink and sales through coin-operated vending machines. Section 166.8–3 concludes "The schedule set forth in this section [referring to section 166.8] shall be used by such retailer in determining amounts to be included in such sales price."

Section 166.8–5 states in its entirety: "The sales price of all taxable items of tangible personal property sold through coin-operated vending machines shall include the sales tax levied by this article, and the schedule set forth in this section must be used by the vendor in determining amounts to be included in such sales price."

These provisions can be summarized as follows. A retailer is responsible for a tax equal to 3% of his gross taxable sales. Section 166.8 states that there shall be "no tax" on sales of less than 19¢. However, when sales are made through a vending machine, the tax may be included in the price and the schedule "shall be used" by the retailer in setting the price. A vendor of articles through a vending machine "must" use the schedule in determining the amounts of tax to be included in the price charged through coin-operated vending machines.

The ordinance is ambiguous and contains contradictory instructions to the retailer. Some provisions require the retailer to apply the tax and schedule in section 166.8. Another holds the retailer liable for 3% regardless of the amount collected under

the schedule. To resolve these apparent conflicts, we apply usual rules of statutory construction.

It is well established that specific provisions of an ordinance or statute control over general provisions. *Bowman v. Eldher*, 149 Colo. 551, 369 P.2d 977 (1962); 2A A. Singer, *Sutherland on Statutory Construction* § 51.05 (1984). In this case, sections 166.8–3 and 166.8–5 only apply to vending machines. Both those provisions use mandatory language ("shall" or "must") regarding the use of the schedule for collecting tax. It thus appears that, with regard to vending machine sales, the "no tax" segment of the schedule controls over the general language found elsewhere. Additionally, because the ordinance placed the publishers in an irreconcilable position we hold that the city invalidly assessed retail sales tax on the publishers' vending machine sales of 15¢ newspapers.

## III.

### THE DECLARATORY JUDGMENT

■ Appellants raise three constitutional challenges to the validity of the ordinance and regulations. Because these claims attack the facial validity of the ordinance and regulations and because they are brought by parties not party to the assessments, we must address these issues despite our determination that the assessments relating to the news carriers, independent distributors, and vending machines must be cancelled.

Appellants first argue that the ordinance and regulations are unconstitutional as a "tax on knowledge" in violation of the first and fourteenth amendments to the United States Constitution and article II, section 10 of the Colorado Constitution. This claim is without merit; so long as newspapers are subjected to no different burden than all other goods, the ordinance does not violate the federal Constitution. *See Arkansas Writers' Project, Inc. v. Ragland*, —— U.S. ——, 107 S.Ct. 1722, 95 L.Ed.2d 209 (1987); *Minneapolis Star & Tribune Co. v. Minnesota*, 460 U.S. 575, 103 S.Ct. 1365, 75 L.Ed.2d 295 (1983).

We agree with the United States Supreme Court that a tax ordinance that treats newspapers as all other goods is not facially invalid. Here, under our construction of the taxing ordinance, newspapers are treated no differently than other goods and so the ordinance is not unconstitutional under article II, section 10 of the Colorado Constitution.

Our resolution of the other issues in the case obviates the need to reach the other constitutional issues raised by the appellants.

The judgment of the trial court is affirmed as to the constitutionality of the ordinance. That portion of the judgment affirming the assessment is reversed.

LOHR, J., concurs in part and dissents in part.

MULLARKEY, J., joins in the concurrence and dissent.

LOHR, Justice, concurring in part and dissenting in part:

I concur in Parts II–A and III of the majority opinion. I dissent, however, from Part II–B of that opinion, in which the majority invalidates a sales tax assessment for vending machine sales of fifteen-cent daily newspapers. I believe that Denver's retail sales tax ordinance clearly contemplates that newspaper publishers will be assessed a tax on the gross receipts from all retail sales, including those sales of fifteen-cent daily newspapers from vending machines.

### I.

#### A.

Basic principles of statutory construction guide an inquiry into the issues presented in this case. A legislative enactment, whether it be a statute or an ordinance, "should be construed in a manner that renders it effective in accomplishing the purposes for which it was enacted, ... and the meaning of any one section must be gathered from a consideration of the entire legislative scheme...." *State Department of Revenue v. Adolph Coors Co.*, 724 P.2d 1341, 1348 (Colo.1986) (Quinn, J., dissenting) (citations omitted). *Accord, e.g.,*

*Safeway Stores, Inc. v. Smith,* 658 P.2d 255, 259 (Colo.1983); *R & F Enterprises, Inc. v. Board of County Comm'rs,* 199 Colo. 137, 606 P.2d 64 (1980). Furthermore, we must construe the enactment so as to give consistent and harmonious effect to all of its terms. *People v. District Court,* 713 P.2d 918, 921 (Colo.1986); *Paxson v. Cresson Mining Co.,* 56 Colo. 206, 212, 139 P. 531, 533 (1913). With these principles in mind, I turn to what I believe to be the proper construction of Denver's retail sales tax ordinance with respect to sales of fifteen-cent daily newspapers from vending machines.

### B.

Code § 166.4[1] levies the retail sales tax at issue in this case. That section provides:

> Taxable Items. There is levied and there shall be collected and paid a tax in the amount stated in this article, as follows:
> 4.1 On the purchase price paid or charged upon *all* sales and purchases of tangible personal property at retail.

(Emphasis added.) Some services and commodities are explicitly exempted from this tax by Code § 166.5, and all of these exemptions are described by the subject matter, rather than the amount, of the sale.

The taxation rate is established by Code § 166.7, which provides that "[e]very retailer shall, *irrespective of other provisions of this article,* be liable and responsible for the payment of an amount equivalent to three percent (3%) of gross taxable sales made by him of commodities or services specified in this article...." (Emphasis added.) "Gross taxable sales" is defined in Code § 166.2–12 as "the total amount received ... from sales and purchases at retail...."

Therefore, it is clear from the plain language of the ordinance that a retailer is liable in the amount of three percent of the gross amount received from *all* retail sales of tangible personal property not exempted by Code § 166.5. "Retail sales" are defined as all sales that are not "wholesale" sales. Code § 166.2–6. It is not disputed that vending machine sales of fifteen-cent daily newspapers do not fall within the ordinance's definition of wholesale sales as contained in Code § 166.2–4. Such sales are therefore "retail sales" and, because they are not classified as exempt from the tax under Code § 166.5, the retailer is liable for three percent of the total amounts received from such sales.

The majority, however, relies on the "tax schedule" set forth in Code § 166.8 to conclude that a retailer is not liable for a tax on retail sales of eighteen cents or less, including vending machine sales of fifteen-cent daily newspapers. This result is not required by Code § 166.8 and in fact flies in the face of the plain language of those ordinance sections set forth previously, which specifically levy and determine the amount of the tax.

When the ordinance is viewed as a whole, it is apparent that the tax schedule set forth in Code § 166.8 is merely a specification of the amount of tax to be charged by retailers to purchasers for sales at particular prices—it does not alter the retailer's tax liability. Indeed, the tax schedule's purpose of assisting the retailer is apparent from the face of the ordinance. The schedule directs the retailer to "round down" the tax charged to the nearest whole number when application of the three percent tax rate results in a given number of cents plus a fractional cent of less than .55. Conversely, the retailer must "round up" the tax when the tax rate yields a fractional .55 cents or more. For example, a retailer is to charge a tax of one cent on a sale of $.51, when the three percent tax rate yields an actual tax of 1.53 cents. The schedule directs the retailer to charge a tax of two cents on a sale of $.52, when the tax rate yields an actual tax of 1.56 cents. In the former case, the tax is rounded down to one cent; in the latter case, the tax is rounded up to two cents. The schedule states that no tax is charged on sales of less than eighteen cents, because the actual tax on $.18 is .54 cents. Consistent with the formula established by the City Council, the tax is rounded down to the nearest whole number, resulting in a tax of 0. The schedule therefore represents a system of averaging and relieves purchasers and re-

---

1. Denver, Colo. Revised Municipal Code (1950) (Code), § 166.4.

tailers from paying and remitting fractional cents.

Code § 166.8 cannot be read to insulate the retailers from the assessment of a three percent tax on gross sales of items priced under eighteen cents. The section simply states that, when establishing the amount of tax to be collected from a purchaser, a retailer must comply with the tax schedule of Code § 166.8. It does not alter the retailer's liability for tax on those sales, since Code § 166.7 explicitly states that the retailer is liable for three percent of gross taxable sales, meaning the total amount of all retail sales not exempted by Code § 166.5, *"irrespective of other provisions of this article...."* (Emphasis added.) If the retailer, acting as the City's collection agent and pursuant to the tax schedule contained in Code § 166.8, collects more than three percent, it must pay the excess over to the city. Code § 166.8–2. If, however, it collects less than three percent, it is still liable for that three percent pursuant to Code § 166.7. Thus, irrespective of the tax schedule set forth in Code § 166.8, the publishers in this case are liable for three percent of the gross amount of all vending machine sales of fifteen-cent daily newspapers.

## II.

In light of the clear intent of the legislative body to tax *all* retail sales not specifically exempted by Code § 166.5, I would hold that the publishers in this case are liable for three percent of the total amount received from all sales of fifteen-cent daily newspapers. Any ambiguities in the ordinance can be readily resolved by harmonizing the various sections to give effect to the entire ordinance consistent with its purpose. Accordingly, I would uphold the assessment against the publishers for vending machine sales of fifteen-cent daily newspapers.

MULLARKEY, J., joins in this partial concurrence and partial dissent.